# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KENNETH MELENDEZ,

        Plaintiff,            :          Case No. 3:05-cv-338

  -vs-                              Chief Magistrate Judge Michael R. Merz

                         :

SINCLAIR COMMUNITY COLLEGE,

        Defendant.

---

**DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

This case is before the Court on Motions for Summary Judgment filed by Plaintiff Kenneth Melendez (Doc. No. 11) and by Defendant Sinclair Community College (Doc. No. 10).  Each party has responded to the other party's Motion (Doc. Nos. 13, 14), and each has filed a Reply in support of its own Motion (Doc. Nos. 15, 16).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157-59 (1970).  Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;  the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law.  Fed. R. Civ. P. 50).  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id*.  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S. Ct. at 2510-11 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp*., 964 F. 2d 577, 582 (6th Cir. 1992)(quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis.  *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996).  "On summary judgment," moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion."  *United States*

*v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962). Thus, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S. Ct. at 2510.

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323;  *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted).  If the moving party meets this burden, the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 587; *Martin v. Ohio Turnpike Comm'n.*, 968 F. 2d 606, (6th Cir. 1992), *cert. denied*, 506 U.S. 1054, 113 S. Ct. 979, 122 L.Ed.2d 133 (1993).

In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990).  Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

**Analysis**

3

The instant Motions for Summary Judgment are true cross-motions in that the parties concede that there are no genuine issues of material fact, but dispute which of them is entitled to judgment as a matter of law.  Compare Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d §2720 (1998).

The undisputed facts are as follows: Defendant is the Montgomery County Community College District which operates Sinclair Community College ("Sinclair").  Defendant is a political subdivision organized pursuant to Ohio Revised Code Chapter 3354 and is governed by a Board of Trustees empowered by statute to appoint administrative officers, faculty, and staff.  Ohio Revised Code § 3354.09(D) and (J).

Sinclair employed Plaintiff as an associate professor of computer information systems in August, 1997.  This was a tenure-track position (i.e., a position which is intended to lead eventually to the granting of tenure for the appointee) which was subject to renewal on an annual basis. Plaintiff's initial contract, which is apparently an exemplar of all the annual contracts, is attached as page 2 of Exhibit B to Defendant's Motion (Doc. No. 10).[1]  The contract provides "Your employment is governed by sufficiency of legislative appropriations and the published provisions of employment (Policies and Procedures Manual, *Faculty Handbook*) which are expressly incorporated in this contract." *Id*. Both parties agree that the Faculty Handbook is a binding part of the employment contract.

Plaintiff was employed continuously for the academic years 1997-1998, 1998-1999, 1999-2000, 2000-2001, 2001-2002, 2002-2003, and 2003-2004, a total of seven years.  It is undisputed that he was never promoted from associate professor to professor during that time.

The Faculty Handbook provides in pertinent part:

---

[1]Neither party has submitted certified copies of documents, nor has either objected to the Court's consideration of uncertified copies.  Given those facts, the Court deems the requirement for certified copies to be waived.  See Fed. R. Civ. P. 56(e).

> Faculty members will be eligible for tenure after five years of full-time tenure-track service in rank.  To initiate the tenure process, the candidate must submit a Tenure  Application form and supporting material to the initial Promotion and Tenure Committee.  The recommendations of this committee will be forwarded to the President, Provost/COO, and Board of Trustees for their consideration.  Tenure is not automatic, but based upon specific criteria listed in section 2.7 .5.

(Ex. A to Doc. 10, p.1.)  The criteria for promotion to professor include having served a minimum of five years in the rank of associate professor. *Id*. at p. 10.  Similarly, the separate requirements for granting of tenure require a minimum of "five full years tenure-track service in rank."  *Id*. at p. 12. Section 2.7 .4 of the Faculty Handbook specifically provides "[C]ontracts of faculty members who have not been granted tenure by the end of their seventh year of full-time contractual employment will not be renewed." *Id*.[2]  The statement is categorical; no exceptions are provided for.  Tenure can be granted in the same year as a promotion and a current year in rank represents a full year.  *Id*. at p. 14.  Thus Plaintiff was eligible to apply for both promotion to professor and tenure in both 2001-2002 and 2002-2003 and apparently did so unsuccessfully (Doc. No. 10, Ex. J., at 2).

Plaintiff applied again for both promotion to professor and tenure in January, 2004.  On, but not before, April 30, 2004, he was notified in writing that he would not be promoted to professor and that he was therefore ineligible for tenure because he had not earned at least one promotion while at Sinclair.  At the same time he was notified that his contract would not be renewed for 2004-2005 because he would reach the end of seven year period at the close of the 2003-2004 academic year without having been granted tenure.  (Exs. E and F to Doc. No. 10.)

The Timing and Action Calendar, §2.5 of the Faculty Handbook, sets January 15 as the deadline for filing promotion and tenure applications, and  May 15 as the"[f]inal date for vice

---

[2]As Plaintiff notes, the same provision is made at §2.9.1 of the Faculty Handbook which notes that the seven-year limitation is in accordance with guidelines of the American Association of University Professors.  (Ex. D to Doc. No. 10.)

president for instruction to give written notification of nonrenewal of contract to nontenured , other

than first-year faculty" and "[f]aculty notified on the merits and promotion/tenure determinations."

(Exhibit C to Doc. No. 10 at 3).

§ 2.4 of the Faculty Handbook provides in part "The College shall notify by certified letter

on or before February 1 of each year any full-time faculty member on current contract who is not

to be reemployed for the following academic year." This language appears in the context of

describing the evaluation process and appears immediately after the words "The Timing and Action

Calendar (2.5) provides the time frame for review and subsequent recommendations." It is

undisputed that Plaintiff was not given notice, by certified mail or otherwise, on or before February

1, 2004, that his contract would not be renewed for 2004-2005. Plaintiff avers that he believed he

would be re-employed for the following year because he did not get that notice (Melendez Affidavit

¶ 5). He further avers "[c]olleges and universities typically begin the selection process for faculty

in the winter months for the upcoming academic year in order to promote continuity." *Id*. at ¶ 7.[3]

Defendant asserts that the February 1st notification is for faculty members who receive an

Unsatisfactory Faculty Annual Performance Review; it notified Plaintiff of this interpretation and

that it disagreed with his interpretation in a letter Vice President for Instruction Jeanne Jacobs wrote

to him on May 12, 2004 (Ex. G to Doc. No. 10). It is undisputed that Plaintiff did not receive an

Unsatisfactory Faculty Annual Performance Review in 2004 and there is no evidence before the

Court that he ever received one. Presumably if he had received such a notice in a prior year, his

contract would not have been renewed for the next year.

Based on these facts, Plaintiff pleads four claims for relief. In the first, he asserts that

Defendant's actions deprived him of his Fourteenth Amendment rights to procedural due process

---

[3]Plaintiff additionally avers that he last wages and suffered other damages as a result of the lack of timely notification, but he does not swear to an amount. Plaintiff's Motion is properly considered a motion for summary judgment on liability only.

(Complaint, Doc. No. 1, ¶ 12).  In the second, he asserts that Defendant's actions denied him his due process rights in violation of Article I, §16 of the Ohio Constitution.  The Third Claim for Relief asserts that Defendant breached Plaintiff's express and/or implied contract of employment and the Fourth asserts that "Defendant's premature and unlawful termination of Plaintiff's continued employment is precluded by the doctrine of promissory estoppel."  *Id*. at ¶¶ 16 and 18.  The Court analyzes these Claims for Relief separately.

## First Claim for Relief

Plaintiff asserts a cause of action for deprivation of procedural due process under 42 U.S.C. §1983.[4]

42 U.S.C. §1983, R.S. §1979, was adopted as part of the Act of April 20, 1871, and reads, as amended:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress , except that in any action brought against a judicial officer, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

The statute creates a cause of action sounding essentially in tort on behalf of any person deprived of a constitutional right by someone acting under color of state law.  *Memphis Community School*

---

[4]Plaintiff mentions 42 U.S.C. §1985 in the course of his Complaint, but pleads no facts which would bring this case under that statute.

*District v. Stachura,* 477 U.S. 299, 106 S. Ct. 2537, 91 L. Ed. 2d 249 (1986); *Carey v. Piphus,* 435

U.S. 247, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).  The purpose of §1983 is to deter state actors

from using the badge of  their authority to deprive individuals of their federally guaranteed rights

and to provide relief to victims if such deterrence fails.  *Wyatt v. Cole*, 504 U.S. 158, 1125 S. Ct.

1827, 118 L. Ed. 2d 504 (1992).  In order to be granted relief,  a plaintiff must establish that the

defendant deprived him of a right secured by the U.S.  Constitution and the laws of the United States

and that the deprivation occurred under  color of state law.  *See West v. Atkins,* 487 U.S. 42, 48, 108

S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Parratt v. Taylor*,  451 U.S. 527, 535, 101 S. Ct. 1908, 68 L.

Ed. 2d 420 (1981); *Flagg Brothers Inc. v. Brooks*, 436  U.S. 149, 155, 98 S. Ct. 1729, 56 L. Ed. 2d

185 (1978).

Municipalities and other bodies of local government are "persons" within the meaning of

§1983 and may therefore be sued directly if they are alleged to have caused a constitutional tort

through a policy statement, ordinance, regulation, or decision officially adopted and promulgated

by that body's officers.  *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.

Ct. 2018, 56 L. Ed. 2d 611 (1978).  Defendant is plainly a person within the meaning of § 1983 and

a state actor within the meaning of the Fourteenth Amendment.

Plaintiff has sued only Sinclair, the political subdivision itself, and not any of its officers who

carried out the acts described above.  It is plain that the acts of denying Plaintiff promotion and

tenure and therefore terminating his employment were the acts of Sinclair as an entity and not the

unauthorized acts of one or more of its employees or agents.  That satisfies the "policy" requirement

of *Monell.*  An unconstitutional governmental policy can be inferred from a single decision by the

highest officials responsible for setting policy in a particular area of the government's business.

*Owen v. City of Independence,* 445 U.S. 622, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980); *Pembaur*

*v. City of Cincinnati,* 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

The Fourteenth Amendment protects persons in the United States from deprivations of life, liberty, or property without due process of law.  Plaintiff here asserts deprivation of a property interest, to wit, continued employment at Sinclair for the 2004-2005 academic year.  The property interests protected from deprivation by the Fourteenth Amendment are in general those property interests created by the States.  *See Board of Regents v. Roth,* 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).

"Government employment amounts to a protected property interest when the employee is entitled to continued employment.  Neither mere government employment nor an abstract need or desire for continued employment will give rise to a property interest.  Rather, a property interest exists and its boundaries are defined by rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bailey v. Floyd Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997).

It is undisputed that Plaintiff never became a tenured faculty member at Sinclair.  Tenure is defined at § 2.7.4 of the Faculty Handbook:

> Academic tenure means the contingent right of the faculty member appointed to a tenured position to retain that position until retirement, removal "for cause," resignation, or program and/or budget exigencies. A tenured appointment is distinguished from an annual appointment or from an appointment for a stated period of years, which expires at a designated time.

(Doc. No. 10, Ex. A, at 12.)  The ordinary reading of that provision makes faculty tenure roughly analogous to a position in the Ohio classified civil service.  It is of course well established that Ohio classified civil servants have a protected property interest in their employment.  *Loudermill v. Cleveland Bd. of Education*, 721 F.2d 550 (6th Cir. 1983).

Although Plaintiff was not tenured, Defendant concedes for purposes of the instant Motions that Plaintiff had "a property interest in continued employment with Sinclair, based upon the provisions of the Faculty Handbook."  (Motion, Doc. No. 10, at 8.)  The Court interprets the

property interest to be employment for the following academic year unless one is notified by February 1 of a given year that one will not be renewed.  In other words, the contract is for a year at a time and is automatically renewed unless terminated by February 1.  To put it another way, Plaintiff does not claim, and could not reasonably claim, that he is entitled to tenured employment, but only that he was entitled to a contract for the 2004-2005 academic year, that his right to that contract "vested" when he was not notified to the contrary by February 1.  Notice by May 12, 2004, is certainly sufficient notice, even on Plaintiff's theory, to prevent automatic renewal of the contract for the 2005-2006 academic year, so it is only an arguable interest in a contract for the 2004-2005 academic year which is in issue.  (See Complaint, Doc. No. 1, ¶ 9.)

Plaintiff relies entirely on his employment contract, incorporating the Faculty Handbook, to create the property interest which he says cannot be taken away without procedural due process. He points to no other customs, rules, or implicit understandings of employment at Sinclair (*See Bailey v. Floyd Bd. of Educ*., *supra*) which would create such a property interest.  There is no state legislation or regulation which creates such an interest.  In fact, Plaintiff offers no evidence that others, either faculty or administration, have in the past interpreted the Faculty Handbook in the way he suggests it should be interpreted.  *Compare Colburn v. Trustees of Indiana University*, 739 F. Supp. 1268 (S.D. Ind. 1990), *aff'd*., 973 F. 2d 581 (7th Cir. 1992).  Instead, he relies on his own understanding and/or the "plain meaning" of the Handbook – "The language of § 2.4 of the SCCFH could not be clearer," he says.  (Doc. No. 11 at 8). To find that Plaintiff has a protected property interest in a contract for the 2004-2005 academic year, then, the Court would have to adopt his interpretation of the Faculty Handbook.

The Court concludes that a reasonable reading of the Handbook does not support Plaintiff's position that it created for him a vested property interest in being reemployed for 2004-2005.  The Handbook plainly indicates that tenure-track faculty get seven years to become tenured and that

those who are not tenured within seven years will be terminated at the end of the seventh year.  It does not provide any other process for that termination beyond notice on the face of the Faculty Handbook that those unsuccessful in achieving tenure by the end of the seventh year will not be renewed for the eighth year.  It allows application for tenure (and for a promotion if that is a necessary prerequisite of tenure) in the fifth year, in the sixth year, and again in the seventh year; essentially, a tenure-track person gets three chances to attain that status.  Plaintiff applied for tenure in the last two weeks of his last chance[5], to wit, in January, 2004, but before the January 15, 2004, deadline.  No person reading the Faculty Handbook provisions would have reasonably understood that the tenure decision was to be made in the two weeks between January 15 and February 1, the date by which Plaintiff says he was entitled to notice. That is a very short time for the tenure process to reach its conclusion, given all the steps involved, but more importantly the Handbook expressly says that notification about promotion and tenure will be made by May 15.  Plaintiff knew that he had to get the promotion to get tenure and that if he did not get tenure, his contract would not be renewed or at least that the Handbook provided it would not be renewed.[6]

Although Plaintiff had a property interest in his 2003-2004 contract, he had no such interest in a 2004-2005 contract which was created or recognized by state law.  In the absence of such property interest, he was not entitled to procedural due process before deprivation.  His First Claim for Relief is without merit.

---

[6]Again, as noted above, Plaintiff provides no evidence of any contrary custom, e.g., that some seventh-year tenure-track faculty who did not get tenure were in fact renewed for another year or more.

**Second Claim for Relief**

In his Second Claim for Relief, Plaintiff asserts Defendant's acts deprived him of due course of law in violation of Article I, § 16 of the Ohio Constitution.

42 U.S.C. §1983 only provides a private right of action for deprivation of federal rights, not state rights.  Any possible deprivation of Ohio constitutional rights is therefore not actionable under § 1983.

In determining whether Ohio law provides such a cause of action, this Court is bound by the determinations of Ohio courts.  28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938).  In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992);  *Miles v. Kohli & Kaliher Assocs.,* 917 F.2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.;  In re Akron-Cleveland Auto Rental, Inc.,* 921 F.2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co.*, 770 F.2d 601 (6th Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F.2d 806 (1987).  The available data to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts,  restatements of law, law review commentaries, and the "majority rule" among other States.  *Bailey*, 770 F.2d at 604. "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on  point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989); *accord Northland Ins. Co. v. Guardsman Products, Inc.*, 141 F.3d 612, 617 (6th Cir.1998). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State*

12

*Farm Fire & Cas. Co.*, 223 F.3d 323, 328 (6th Cir.2000); *Puckett,* 889 F.2d at 1485. *Ziegler v. IBP Hog Market*, 249 F.3d 509, 517 (6th Cir. 2001).

The parties cite no authority on the Second Claim for Relief. The only authority the Court has been able to find is *PDU, Inc., v. City of Cleveland,* 2003 WL 2155157 (Ohio App. 8th Dist. July 10, 2003), which plainly holds that there is no private right of action in Ohio law for violations of Article I, § 16.

Applying *PDU*, the Court finds Plaintiff's Second Claim for Relief is without merit.

### Third Claim for Relief

In his Third Claim for Relief, Plaintiff asserts that Defendant breached his employment contract with it by not notifying him by February 1, 2004, that he would not be renewed for the following academic year, 2004-2005 (Complaint, Doc. No. 1, at ¶¶ 15-16.)

The parties agree that the Faculty Handbook was a binding part of Plaintiff's contract of employment, so there is no need to review the Ohio law governing whether such employee handbooks created binding contracts. Here, it did. The question is how the contract is to be interpreted.

Ohio law governs the Court's determination of the Third Claim for Relief. *Erie Railroad, supra.* Under Ohio law, "interpretation of written contract terms is a matter of law for initial determination by the court.... It is only when the relevant contract language is ambiguous that the job of interpretation is turned over to the fact finder ... and the determination whether a contract is ambiguous is made as a matter of law by the court." *Construction Interior Sys., Inc. v. Marriott Family Restaurants, Inc.*, 984 F.2d 749 (6th Cir. 1993), quoting *Potti v. Duramed Pharmaceuticals*, 938 F.2d 641 (6th Cir. 1991). It is for the court in the first instance to decide, as a matter of law,

if the contract is ambiguous. *D. L. Baker & Co. v. Acosta*, 720 F. Supp. 615, 618 (N.D. Ohio, 1989); *accord, Potti, supra. Potti* also holds that ambiguity only exists where a term cannot be determined from the four corners of the agreement or where the contract language is susceptible to two or more reasonable interpretations, citing *Wells v. American Elec. Power Co.*, 48 Ohio App. 3d 95, 548 N.E. 2d 995 (1988).

Reasonably interpreted, the Faculty Handbook has the meaning argued for by Defendant. The Handbook is clear that a tenure-track person gets only seven years to achieve tenure and that decisions about tenure (or prerequisite promotions) are announced by May 15 of any given year, not by February 1. If the Handbook meant what Plaintiff says it means, all the process for tenure consideration would have to be collapsed into two weeks time. The terms are not inconsistent in that they can reasonably be read as Defendant contends – the February 1 notice applies to those faculty members who receive an unfavorable annual performance review. Given the size of Sinclair College, there is probably a large group of faculty to whom the annual review process applied, but a much smaller group to whom the seven-year limitation on tenure track employment applies, so it is reasonable to have made different rules applying to the different classes of persons.

As noted above with respect to Plaintiff's § 1983 claim for relief, Plaintiff has submitted no evidence that anyone else has read the Faculty Handbook as he contends it should be read, much less that such a reading has been customary.

Plaintiff does rely on an effort by Vice President Jacobs to eliminate the arguable ambiguity in the Faculty Handbook, an effort she made after he contended for the reading on which he relies in this suit. As anyone with a passing familiarity with post-modern literary criticism realizes, arguments for different readings of texts are always possible; some such alternative readings have earned their proponents tenure in academic faculties. A prudent college administrator, faced with an arguable ambiguity in faculty employment contracts, would do what she could to eliminate the

argument, particularly since once an argument has been made, it is likely to be picked up by others who can benefit from it. Although not excluded by Fed. R. Evid. 407[7], Vice President Jacobs' attempt at amendment bears little weight in Plaintiff's favor for the same reasons the courts exclude subsequent remedial measures: we do not wish to discourage remediation. But here there is little evidence remediation was needed: so far as the Court is informed, no one except for Plaintiff ever held the interpretation on which he relies and he adopted it only after his hope for tenure expired.

In sum, Plaintiff is not entitled to recover for breach of contract because Defendant committed no breach. Given this conclusion, the Court need not resolve the dispute between the parties over whether Plaintiff was required to exhaust contractual remedies for the alleged breach.

**Fourth Claim for Relief**

In his Fourth Claim for Relief, Plaintiff asserts "Defendant's premature and unlawful termination of Plaintiff's continued employment is precluded by the doctrine of promissory estoppel" (Complaint, Doc. No. 1, at ¶18). Neither party argues this claim for relief in the instant Motions, except for their disagreement over the obligation to exhaust contractual remedies.

The promissory estoppel doctrine in the employment context in Ohio has developed as an exception to employment at-will, rather than as an alternative method of recovery in derogation of an express contract. See *Helmick v. Cincinnati Word Processing, Inc.,* 45 Ohio St. 3d 131, 543 N.E. 2d 1212 (1989). Assuming that the doctrine would apply, however, Plaintiff is missing a crucial element: a specific promise of continued employment. *Wing v. Anchor Media Ltd.,* 59 Ohio St.3d

---

[7]Fed. R. Evid. 407 excludes evidence of measures taken after an injury or harm is suffered which would have made the injury or harm less likely. The Court reads this language as directed to a tort setting. While it is true that ambiguous language in a contract may injure or harm someone who relies on a particular interpretation, this does not appear to be the kind of harm intended by the use of "injury or harm" in the Rule.

108, 570 N.E. 2d 1095 (1991); *Helmick, supra.*  To the contrary, as discussed above, what Defendant expressly told Plaintiff was that if he had not been granted tenure by the end of his seventh year of tenure-track teaching, he would **not** be employed any longer.  Plaintiff's Fourth Claim for Relief also fails on the merits.

## Conclusion

There are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law.  Therefore Defendant's Motion for Summary Judgment (Doc. No. 10) is granted and Plaintiff's Motion for Summary Judgment (Doc. No. 11) is denied.  The Clerk will enter judgment in favor of Defendant and against Plaintiff, dismissing the Complaint herein with prejudice.

January 6, 2007.

s/ Michael R. Merz
Chief United States Magistrate Judge